## RETRANSMISSION CONSENT AGREEMENT

This Retransmission Consent Agreement ("Agreement") is made as of December 15, 2005 by and between WBNS-TV, Inc., licensee of WBNS-TV, Columbus, Ohio ("WBNS" or the "Station") and INSIGHT COMMUNICATONS COMPANY, L.P. (the "Operator").

WHEREAS, WBNS is licensed by the Federal Communications Commission ("FCC") to operate in Columbus, Ohio, a community in the Columbus Designated Market Area ("DMA") and transmits an analog broadcast signal on channel 10 ("Analog Signal") and transmits a digital broadcast signal on channel 21 or such other channel as may hereafter be designated by the FCC ("Digital Signal") (the Analog Signal and the Digital Signal, collectively, the "Broadcast Signal"); and

WHEREAS, Operator (or one or more of its affiliates) owns, leases, manages or otherwise controls or possesses each cable television system or multi-channel video programming distribution system (the "Cable System(s)") serving the areas and/or communities listed on Exhibit A, as may be amended from time to time; and

WHEREAS, Station and Operator desire to have the Broadcast Signal retransmitted over the Cable System(s).

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and agreements set forth herein, the parties agree as follows:

1. **Term.** The term of this Agreement shall commence on January 1, 2006 and end on December 31, 2008 (the "Term").

2. **Retransmission Consent.** WBNS hereby elects to give Operator its consent, pursuant to Section 325(b) of the Communications Act of 1934, as amended, and the rules and regulations of the FCC, to the nonexclusive retransmission of the Broadcast Signal by the Cable System(s) in accordance with the terms of this Agreement. Such consent will continue to be in effect throughout the Term unless otherwise terminated pursuant to the terms of this Agreement.

3. **Consideration.** The mutual covenants and agreements set forth herein are full and complete consideration for the right to transmit the Station's Broadcast Signal over the Cable System(s) in the Columbus DMA.

4. **Analog Signal Carriage.**

   a. **Carriage Obligation.** Unless otherwise agreed to by WBNS, Operator shall retransmit the Analog Signal on the Cable System(s) throughout the Term on a basic tier of service that (i) is available to and viewable by all subscribers to the Cable System(s) ("Subscribers") and (ii) includes the broadcast signals of all other stations located in the DMA.

   b. **Channel Position.** The Operator shall cause the Cable System(s) to retransmit the Analog Signal on channel number 10, which shall be a single channel dedicated solely to the full-time retransmission of the Analog Signal. If Operator is required by applicable

<div style="border: 1px solid black; text-align: center;">

**EXHIBIT**

**A**

</div>

law to provide other programming on channel number 10, Operator and WBNS shall agree to an alternative channel for carriage of the Analog Signal.

        c.     **Non-Degradation.** The Operator agrees to carry the entire Analog Signal without interruption or alteration, including the primary video, audio, and all Program-related Material. Signal enhancements (such as ghost canceling) may be deleted by Operator upon prior written notice to the Station so long as those enhancements are reintroduced in a comparable fashion at the Cable System's headend. Carriage of the Analog Signal must be without material degradation and so that the Analog Signal is of equal or better quality to all other signals provided on the Cable System(s) (but in no event shall the quality of the Digital Signal as retransmitted by a Cable System be required to be superior to the quality of the Digital Signal as received by such Cable System from the Station). As used in this Agreement, Program-related Material shall mean (i) closed-captioning data and related information; (ii) program identification codes; (iii) program ratings information; (iv) content advisory information; (v) any data or information that the FCC or any other applicable law or regulation requires either WBNS or Operator to transmit or carry as part of the Broadcast Signal at any time; (vi) any other material or information now or hereafter qualifying as program-related material pursuant to the FCC's must carry rules; and (vii) any other material or information mutually agreed to in writing by the parties. No portion of the Broadcast Signal shall include any fee-based content; any data-casting, ancillary or supplementary services or other non-broadcasting services; or any interactive element or transactional application that requires the functionality of a two-way cable plant.

        d.     WBNS shall deliver to the principal headend of each Cable System a good quality signal (as defined in Section 76.55 of the FCC's rules) as measured at such headend. The Analog Signal must include parental advisory codes and related program rating information for all network programs broadcast by WBNS. Operator will pass through to viewers all such information unchanged.

    5.     **Digital Signal Carriage.**

    a.     **Carriage Obligation.** Unless otherwise agreed to by WBNS, Operator shall retransmit on Cable System(s) that have been or at any time during the Term are rebuilt to a physical infrastructure with a bandwidth capacity of at least 750 MHz, the entire portion of the 19.4 megabit data stream transmitted within the 6 MHz band comprising the Primary Program Transport Stream (as defined below) that WBNS provides for free over the air. All portions of the Digital Signal shall be contained within a maximum 19.4 megabit per second data stream and may, in WBNS's sole discretion, include without limitation one or more channels of full screen video and audio programming in HDTV format and/or one or more channels of full screen video and audio programming in non-HDTV format ("Multicast Streams") and/or any other material that WBNS provides for free over the air provided that any such Multicast Stream or material is a Qualifying Multiplexed Digital Signal (as defined below). Operator shall launch such Qualifying Multiplexed Digital Signal on each Cable System that carries the Primary Program Stream no later than ninety (90) days after the date of a written notice from Station requesting carriage describing in detail the content to be included and a proposed program line-up and telecast schedule. A "Qualifying Multiplexed Digital Signal" shall mean a Multicast Stream (i) that is owned, operated and programmed by the Station (e.g. has not been sold, leased or subleased to a third party); (ii) that is branded with the Station's call letters or the Station's local identifier or brand (e.g. "CBS 10" or "Eyewitness News"); (iii) that does not contain any home

shopping, infomercial, religious programming, or other programming that solicits contributions airing outside the 12:00 midnight to 6:00 a.m. time period; (iv) that is not affiliated with a then-existing broadcast television network (other than the Station's primary affiliated network) of which such programming service is carried on a Cable System carrying such Station's Primary Program Transport Stream; (v) that is neither affiliated with nor contains programming from a then-existing cable television programming service; (vi) for which Station does not receive or seek a fee from Operator, any Cable System or any Cable System subscriber; (vii) that is transmitted by the Station to the public by over-the-air terrestrial means on a twenty-four hours per day, seven days per week basis; (viii) that if carried by Operator, would not cause Operator to incur any additional copyright compulsory license fee; and (ix) that does not contain any data-casting, ancillary or supplementary services, or other non-broadcasting services. Operator shall retransmit the Digital Signal on a basic tier of digital service that (i) includes the digital signals, if any, of other broadcast stations located in the DMA, including those stations affiliated with the ABC, CBS, Fox or NBC (collectively, "Big Four") television networks and (ii) is delivered to all subscribers of the Cable System(s) that are equipped with television sets, set-top boxes, and/or other digital equipment capable of receiving and processing any digital cable services offered by Operator ("Digital Subscribers"). At no time during the Term shall Operator charge Digital Subscribers a separate fee to receive WBNS's Digital Signal in whatever format WBNS may choose to deliver it, provided, however, that Operator may charge such fees as a subscription fee for receipt of such level of programming services, a recurring charge for the digital set-top box, decoder, or other customer premises equipment necessary to receive the Digital Signal, and charges for installation of such hardware. WBNS acknowledges that Operator's present efforts are sufficient to notify Subscribers and Digital Subscribers of the availability of set-top boxes that are capable of receiving WBNS's Digital Signal.

      b.      **Channel Position and Navigation.** Operator shall retransmit the programming stream that WBNS designates as the primary program transport stream of the Digital Signal ("Primary Program Transport Stream") on a single channel dedicated solely to the full-time retransmission of the Primary Program Transport Stream. Operator shall retransmit WBNS's Primary Program Transport Stream and Multicast Streams, if any, in the same general channel "neighborhood" as the primary program transport streams of the digital broadcast signals, if any, of other local television broadcast stations that are affiliated with the Big Four television networks and carried on the Cable System(s). In transmitting the Digital Signal, Operator shall comply with the Advanced Television Systems Committee ("ATSC") standard A/65 Program and System Information Protocol ("PSIP") and, except where inconsistent with PSIP, Society of Cable Engineers ("SCTE") standard DVS-097, or the respective successors thereto, or as required by any applicable law, rule, order and/or FCC regulation. Operator agrees to take all reasonably necessary steps to ensure that the Cable System(s)'s facilities, including any set-top boxes it provides, preserve PSIP channel mapping functionality in the Digital Signal. If Operator at any time during the Term provides to any of a Cable System(s)'s Subscribers or Digital Subscribers an on-screen interactive program guide or other navigational device ("EPG"), Operator shall include the Station's programming information in a manner reasonably comparable to other local broadcast television stations so long as the Station is providing comparable information and data for the Analog Signal and/or Digital Signal, as applicable.

c. **Non-Degradation.** Operator shall retransmit the Digital Signal to Digital Subscribers without interruption, downconversion or material degradation and so that the Digital Signal is of equal or better quality to each other digital signal provided on the Cable System(s) (but in no event shall the quality of the Digital Signal as retransmitted by a Cable System be required to be superior to the quality of the Digital Signal as received by such Cable System from the Station). Operator shall have the right to remodulate the Digital Signal and package such Digital Signal with other digital broadcast signals multiplexed within a single 6 MHz channel so long as such remodulation or statistical multiplexing does not materially degrade the quality of the Digital Signal as received by a Cable System from the Station. Operator retains and reserves all rights in and to all signal distribution capacity within the bandwidth of the Digital Signal other than the bandwidth used at any given time dedicated to the distribution of the Digital Signal.

d. If WBNS voluntarily, or pursuant to FCC directive, operates in a digital-only mode and/or permanently ceases to transmit the Analog Signal, then Operator may carry the primary video and related audio portion of the over-the-air programming of WBNS in a digital format (including in a standard definition digital format), and Operator will have no further obligation to carry or to reserve spectrum to carry any analog programming of WBNS. In addition, at such time during the term of this Agreement, if at all, that the percentage of cable subscribers with one or more digital receivers (such as a set top box or any other device capable of receiving digital television signals) receiving digital television broadcast signals from a Cable System retransmitting the Analog Signal is equal to one-hundred percent (100%) of the total number of subscribers receiving cable services from such Cable System, then such Cable System may retransmit WBNS exclusively in a digital format (including in a standard definition digital format).

e. WBNS, at its own expense, shall ensure that it delivers a good quality Digital Signal to the principal headend of each Cable System, delivered in a manner such that the technical strength and quality of the video and audio components of the Digital Signal, as delivered to such Cable System headend, is of adequate quality to permit reliable reception and that the Digital Signal meets or exceeds FCC technical standards applicable to digital television broadcast stations.

6. **Additional Systems.** If at any time during the Term Operator acquires, owns, operates or manages any new cable television or other multi-channel video programming distribution system that provides service to WBNS's DMA, in whole or in part, or to Subscribers the majority of which reside in counties in which WBNS's Broadcast Signal is "significantly viewed" (as defined by Section 76.54 of the FCC's rules or similar authority) (any such system, an "Additional System"), then such Additional System shall thereupon (and without further action of the parties) be deemed to be a Cable System for purposes of this Agreement and Exhibit A hereto shall be deemed to be amended to include such Additional System. If at any time during the Term Operator acquires, owns, operates or manages any new cable television or other multichannel video programming distribution system that is not an Additional System, such new cable television or other multi-channel video programming distribution system may be designated a Cable System (and added to Exhibit A hereto) by Operator with the prior written consent of WBNS.

- 4 -

7.     **Additional Stations.**  If Station or any entity controlling, controlled by or under common control with Station (a "Station Affiliate") acquires ownership of in the DMA or otherwise manages, operates, programs or controls another broadcast television station in the DMA (an "Additional Station"), then Operator shall have the right either (a) to expand the scope of this Agreement to include such broadcast television station and its broadcast television signals for all purposes of this Agreement, and in such event to terminate any pre-existing retransmission consent agreement between Operator or any of its affiliates and the prior owner, operator or manager of such Additional Station, (b) to require Station or such Station Affiliate to assume any such pre-existing retransmission consent agreement in which event carriage of the broadcast television signal(s) of such Additional Station on the Cable Systems by any of its affiliates shall continue to be governed by the terms of such pre-existing retransmission consent agreement, or (c) if the Additional Station is being carried by a Cable System on a "must-carry" basis, to continue carriage of the Additional Station on such Cable System on a "must-carry" basis until such time as Station or such Station Affiliate is permitted by statute or the rules and regulations of the FCC to elect to grant retransmission consent for such Cable System's carriage of the Additional Station.

8.     **Most Favored Station.**  If any broadcast television station (NBC, ABC, CBS or FOX) in the Columbus DMA has, in an agreement with Operator for the carriage of such television station's signal, a "cash-for-carriage" provision relating to the retransmission of such station's signal on a System in the Columbus DMA, Insight shall offer a comparable "cash-for-carriage" provision to WBNS based on a station by station basis subject to the conditions set forth below, with respect to the retransmission of such Station's Signal on such System, until the earlier of the expiration of this Agreement or the expiration of the other broadcaster's agreement; provided, however, the entire retransmission agreement and all related agreements with such other broadcast television station and its affiliates shall be compared to this Agreement and all related agreements with Station or its affiliates to determine the "cash-for-carriage" provision with offsets for the value of any consideration or services that Operator is currently providing to Station or its affiliates in any manner. In addition, in order to avail itself of the benefits of any such "cash-for-carriage" provision, WBNS must agree to comply with all terms and conditions applicable to such other broadcast television station based on a station by station basis that are imposed as a directly related condition of the receipt of such "cash-for-carriage" provision. "Cash-for-carriage" shall only mean a cash payment (or cash equivalent, cash offset or cash credit) by Operator for the right to retransmit a broadcast television station's signal pursuant to the Communications Act of 1943, as amended and the rules and regulations of the FCC which such payment is based on the number of cable subscribers receiving such signal.

9.     **Representation and Warranties.**

a.     **WBNS's Representations.**  WBNS represents and warrants that: (i) WBNS is a corporation duly organized, validly existing and in good standing under the laws of the State of Ohio; (ii) WBNS has the requisite power and authority to execute and deliver this Agreement and to fully perform its obligations hereunder; (iii) WBNS is not subject to any contractual or other legal obligation which will in any way interfere with its full performance of this Agreement; (iv) the individual executing this Agreement on behalf of WBNS has the authority to do so; (v) WBNS holds a valid license to operate a television broadcast station from the FCC; (vi) none of the programming provided by the Station (A) will violate any FCC broadcast rule or regulation, (B) is or will be libelous, slanderous, obscene, defamatory or

indecent, or (C) violates or infringes or will violate or infringe the civil or property rights, copyrights (including, without limitation, music synchronization and performance rights and dramatic and non-dramatic music rights), trademark rights, patent rights or rights of privacy of any person; and (vii) the Station is a primary affiliate of the CBS television network.

        **b.**      **Operator's Representations.** Operator represents and warrants that: (i) Operator is an entity duly organized, validly existing and in good standing under the laws of its state of formation and is in good standing in Ohio; (ii) Operator has the requisite power and authority to execute and deliver this Agreement and to fully perform its obligations hereunder; (iii) Operator is not subject to any contractual or other legal obligation which will in any way interfere with its full performance of this Agreement; (iv) the individual executing this Agreement on behalf of Operator has the authority to do so; (v) Operator (or one or more of its affiliates) owns, operates or manages the Cable System(s); (vi) each Cable System is either a "cable system" or "multi-channel video programming distributor" as defined in Section 602 of the Communications Act of 1934, as amended; and (vii) Operator (or one or more of its affiliates) holds a valid franchise awarded by the appropriate governmental authority (or any equivalent required authorization (if so required) if no franchises are awarded) to operate each Cable System in each area it serves.

        10.      **Indemnification.** WBNS shall indemnify and hold harmless Operator, its affiliates, and the officers, directors, employees, shareholders, partners and agents of each from and against any and all third party claims, liability, causes of action, and costs (including reasonable attorneys' fees) arising from, or in connection with, any breach of this Agreement by WBNS. Station will further indemnify and hold harmless Operator, its affiliates and the officers, directors, employees, shareholders, partners, and agents of each, from and against any and all claims, liability, causes of action and costs (including reasonable attorneys' fees) which arise out of the content or retransmission of any programming transmitted by it (including, but not limited to, all programming matters, sponsorship, promotional and advertising spots) and anything else inserted by the Station in its signals including, without limitation, any based upon libel, slander, defamation, indecency, obscenity or any other form or forms of unprotected speech, invasion of the right of privacy or publicity, or violation or infringement of copyrights (including music performance rights for any and all performances through to Cable System subscribers unless Operator is required by law to maintain music performance licenses for the Station's programming carried hereunder), literary or music synchronization rights, trademark rights or patent rights, or otherwise arising out of the content of the Station's signals or carriage thereof on a Cable System. Operator shall indemnify and hold harmless WBNS, its affiliates, and the officers, directors, employees, shareholders, and agents of each from and against any and all third party claims, liability, causes of action and costs (including reasonable attorneys' fees) arising from, or in connection with, any breach of this Agreement by Operator, including, but not limited to, Operator's violation of any applicable federal, state or local law, rule or regulation or any alterations, additions or deletions to the Broadcast Signal by Operator.

        11.      **Termination.** Either WBNS or Operator may terminate this Agreement by giving the other written notice, if the other has made a material misrepresentation or has materially breached its duties or obligations hereunder, and such misrepresentation or breach is not cured within thirty (30) days of such notice. In addition, Operator may terminate this Agreement and/or drop the Broadcast Signals with respect to any or all of the Cable Systems upon thirty (30) days notice if (a) the compulsory copyright license pursuant to 17 U.S.C. § 111 is no longer available

or if the cost of such compulsory license is materially increased due to any change in applicable law or regulation, (b) the Station changes or loses its network affiliation; or (c) the Station fails, for any reason other than the reasons provided in Section 14 hereof, to broadcast good quality signals as required by this Agreement for more than seven (7) consecutive days, or for more than thirty (30) days in the aggregate during the term of this Agreement.  In addition, a Cable System may cease carrying the Analog Signal with respect to any portion of such Cable System that (y) carries another television station in the Station's DMA that is affiliated with the same network as the Station and that is licensed to a community that is closer to the Cable System's principal headend than the Station's city of license, or (z) is outside of the Station's DMA.  Termination of the Agreement is in addition to any other rights or remedies available to the party.

      12.    **Copyright and Trademarks.**  Carriage of the Broadcast Signal pursuant to this Agreement does not convey any license or sublicense in or to the copyrights of and to the underlying programming transmitted by WBNS.  Operator recognizes WBNS's exclusive right, title, and interest in and to the copyright for the Broadcast Signal and WBNS's license to broadcast the programming and the trademarks, names and logos of the programming that may hereafter be used.

      13.    **Unauthorized Use.**  Operator shall not, for pay or otherwise, record, copy, duplicate, retransmit and/or authorize the recording, copying, duplication or transmission of any portion of the Broadcast Signal without prior written permission of WBNS.  This Section does not restrict the practice by Operator of (i) connecting distribution cables to Cable System subscribers' videotape recorders or other customer premises devices or cable network functionalities intended for home duplication of video or audio programming or to provide subscribers with VCR-like functionality (*e.g.*, "pause", "rewind") so long as the Station is not the only television station for which such functionality is being provided to subscribers, or (ii) incidental caching or storage of the Broadcast Signals in connection with digital (including switched or IP) transmission by a Cable System.   Should Operator become aware of a third party performing such unauthorized recording, copying, duplication or retransmission, other than for private home use, Operator shall use commercially reasonable efforts to promptly notify WBNS, provided, however, that Operator shall have no responsibility hereunder for any action taken by any subscriber or for any failure of Operator to provide such notice.

      14.    **Force Majeure; Consequential Damages.**  Any delay, preemption or other failure to perform caused by factors beyond the parties' reasonable control, such as an Act of God, labor dispute, nondelivery by program suppliers, war, riot, technical breakdown, or government order or regulation, shall not result in a breach of the terms of this Agreement.  Each party shall exercise its reasonable efforts to cure any such delays and the cause thereof, and performance under the terms of this Agreement shall be excused for the period of time during which such factor continues.

      Notwithstanding any other provision in this Agreement to the contrary, neither WBNS nor Operator shall be liable to the other party for incidental, consequential or special damages (including, but not limited to, loss of profits or revenues, or damages to or loss of personal property) in any cause of action arising out of, related to, or in connection with a breach of this Agreement.

      15.    **Assignment.** Neither party shall transfer or assign its rights or obligations hereunder to any other entity without the prior written consent of the other party, which consent shall not be unreasonably withheld, provided that either party may, without consent, assign (or partially assign with respect to Operator if applicable) this Agreement to any person or entity that acquires all or

substantially all of the party's assets (or one or more of the Cable System(s), with respect to the Operator) and agrees in writing to assume all of the party's rights and obligations under this Agreement.

16. **Entire Agreement.** This Agreement constitutes the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior or contemporaneous, express or implied, written or oral, agreements, representations, or conditions between the parties with respect thereto. This Agreement may be modified, amended, or waived only by a written instrument signed by the parties.

17. **Reservation of Rights.** This Agreement conveys to Operator only those rights that are expressly stated herein. All other rights with regard to the Broadcast Signal not specifically granted herein are reserved to WBNS. Nothing herein shall affect any other rights WBNS may have in relation to Operator or the Cable System(s), including but not limited to syndicated exclusivity or network non-duplication rights.

18. **Severability.** The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision of this Agreement. Notwithstanding the foregoing, if one or more provisions of this Agreement are held to be unenforceable under applicable law, then such provision(s) shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

19. **No Joint Venture or Principal-Agent Relationship; No Station Relationship with Subscribers.** Nothing in this Agreement shall create any joint venture or principal-agent relationship between WBNS and Operator. No Subscriber shall be deemed to have any direct or indirect contractual relationship with Station by virtue of this Agreement, nor shall any Subscribers be deemed to be a third party beneficiary of this Agreement.

20. **Taxes.** WBNS shall not be liable for any sales, use, excise, income, franchise, corporate and similar taxes and fees (including, without limitation, any fees payable to local or state franchising authorities) and other charges which are or may be imposed upon or assessed against Operator or any Cable System(s) (including, but not limited to, any taxes, fees or charges which are based upon or measured by revenues derived by Operator from the exploitation of the rights granted to Operator pursuant to this Agreement).

21. **Notices.** All notices, demands, requests or other communications which may be or are required to be given, served or sent by any party to any other party pursuant to this Agreement shall be in writing and shall be transmitted by personal delivery, by registered or certified mail, return receipt requested, postage prepaid by an overnight delivery service, or by facsimile with telephone confirmation, addressed as follows or to such address as may be specified in writing by the party to whom the notice is to be given:

To WBNS:   WBNS-TV, Inc.
770 Twin Rivers Drive
Columbus, OH 43216-1010
(614) 460-2814 (Fax)
Attn: General Manager

- 8 -

With a copy to:

> Covington & Burling
> 1201 Pennsylvania Avenue NW
> Washington, DC  20004-2401
> (202) 662-6291 (Fax)
> Attn:  Jennifer Johnson
>
> AND
>
> Zeiger, Tigges, Little & Lindsmith LLP
> 41 S. High Street, Suite 3500
> Columbus, OH  43215
> (614) 365-9145 (Fax)
> Attn:  Marion H. Little, Jr.

To Operator:

> Insight Communications Company, L.P.
> Attn:  Brian Shirk
> 3770 E. Livingston Ave.
> Columbus, OH 43227
> Fax: 614.238-7023

with a copy to:

> Insight Communications Company, L.P.
> 810 7th Avenue, 41st Floor
> New York, NY  10019
> (917) 286-2301 (Fax)
> Attention:  Legal Dept.
>
> AND
>
> Insight Communications Company, L.P.
> 810 7th Avenue, 41st  Floor
> New York, NY  10019
> (917) 286-2301 (Fax)
> Attention:  Vice President–Programming

A party may designate a new address to which notices required or permitted to be given pursuant to this Agreement shall thereafter be transmitted by giving written notice to the other party.  Each notice transmitted in the manner described in this Section shall be deemed to have been given, received and become effective for all purposes (i) at the time it shall have been delivered to the addressee as indicated by the return receipt, the affidavit of the messenger, the records of the overnight delivery service or upon confirmed receipt of a facsimile transmission, if subsequently confirmed by U.S. mail or overnight delivery service or (ii) three (3) days after presented for delivery to the addressee as so indicated during normal business hours, if such delivery shall have been refused for any reason.

22.  **Applicable Law.**  This Agreement shall be governed by and construed under and in

accordance with the laws of the State of Ohio (excluding the choice-of-law provisions thereof), subject to applicable provisions of the Communications Act of 1934, as amended, and applicable rules, regulations and orders of the FCC. Nothing herein shall require any party to take any action that would result in the violation of any applicable federal, state or local law or regulation.

23. **Survival.** All representations, warranties and indemnifications set forth herein shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

24. **EAS Overrides.** To the extent permitted by Section 11.51 of the FCC's rules, or any successor thereto, the parties agree that Operator shall not preempt, override, interrupt or otherwise alter EAS messages that WBNS provides on the Broadcast Signal, nor shall Operator preempt, override, interrupt or otherwise alter news or weather related emergency information that WBNS provides on the Broadcast Signal by transmitting a local or state EAS message or alert over the Cable System(s).

IN WITNESS WHEREOF, each of the parties has executed this Agreement as of the date first written above.

WBNS-TV, Inc.

By:_____
Name:Thomas C. Griesdorn
Title: Vice President & General Manager

INSIGHT COMMUNICATIONS COMPANY, L.P.

By: Insight Communications Company, Inc., its General Partner

By:_____
Name: BRIAN J. SHIRK
Title: DISTRICT VICE PRESIDENT

**Exhibit A**
**Communities Served by the Operator**

Columbus

i

# FIRST AMENDMENT

THIS FIRST AMENDMENT (this **"Amendment"**) is made as of the 28th day of May 2008, by and between WBNS-TV, Inc. (**"WBNS"**), licensee of WBNS-TV, Columbus, Ohio (the **"Station"**), and Insight Communications Company, L.P. (**"Operator"**).

## RECITALS

A.     WBNS and Operator entered into that certain Retransmission Consent Agreement for the Station dated as of December 15, 2005 (the **"Agreement"**), pursuant to which WBNS granted consent to Operator's carriage of the Station's Analog Signal and Digital Signal on certain Cable Systems owned by Operator, and Operator agreed to retransmit the Station's Analog Signal and Digital Signal on such Cable Systems; and

B.     WBNS and Operator now desire to amend the Agreement as set forth herein.

## AGREEMENTS

In consideration of the above recitals and of the mutual agreements and covenants contained in this Amendment, WBNS and Operator, intending to be bound legally, agree as follows:

1.     Amendment.

(a)     Term.  Section 1 of the Agreement is hereby amended such that the term of the Agreement shall end on December 31, 2013.

(b)     Cable Systems.  Exhibit A of the Agreement is deleted and replaced in its entirety with the Exhibit A attached hereto.

(c)     Video On Demand.  WBNS grants Operator the non-exclusive rights to distribute on a video-on-demand basis ("VOD") the Station's local content during the term and any other content broadcast by Station for which it has obtained the right to grant VOD rights to Operator.  Operator may record, encode, store, and make available over the Cable System the VOD content so that subscribers can select and view the content with VOD functionality.  This content will be available immediately after the original airing is complete on Station.

2.     Miscellaneous.

(a)     Other Provisions; Effectiveness.  Except as modified by the express terms of this Amendment, all provisions of the Agreement shall remain in full force and effect.  This Amendment shall be a legally valid and binding agreement enforceable in accordance with its terms upon its execution by WBNS and Operator.

(b)     Reference to Agreement; Capitalized Terms.  It shall not be necessary to refer to this Amendment in any reference to the Agreement.  Any reference to the Agreement shall be deemed to be a reference to the Agreement as amended in accordance herewith.  All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

(c)     Execution in Counterparts.  This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when executed

and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the undersigned has caused this instrument to be duly executed as of the date first written above.

WBNS-TV, INC.

By: _____
Title: _____

INSIGHT COMMUNICATIONS
COMPANY, L.P.

By: _____
Title: _____

EXHIBIT A

**Communities Served by Operator**

Columbus