*Execution Copy*

January 4, 2012

Dispatch Printing Company d/b/a Dispatch Broadcast Group
770 Twin Rivers Drive
Columbus, OH 43216
Attention: Michael J Fiorile

Re: Retransmission Consent for Dispatch Broadcast Group-Owned Full Power Broadcast Stations ("Station(s)")[1] and Carriage of Ohio News Network ("ONN") Service

Dear Mr. Fiorile:

This letter agreement ("Agreement") sets forth the understanding between Dispatch Broadcast Group ("Owner") and Time Warner Cable Inc. ("Operator"), on behalf of itself and each Time Warner Cable Company (as defined below) that owns or manages a System (as defined below) that is subject to this Agreement concerning the retransmission of the broadcast signal of each of the Stations (each, a "Signal") and carriage of the ONN service.

     1.    Grant. Pursuant to Section 325(b) of the Communications Act of 1934, as amended, Owner hereby grants Operator the right to retransmit each Station's Signal (including each primary and multicast program transport stream contained therein) over each multichannel video programming distribution system owned or managed by a Time Warner Cable Company (each, a "System") currently carrying such Signal, located within the Station's DMA, and/or that is located in an area where the Station is significantly viewed. "Time Warner Cable Company" means (*a*) any of Operator, Time Warner Entertainment Company, L.P. ("TWE"), Time Warner NY Cable LLC ("TWNY") or Time Warner Entertainment-Advance/Newhouse Partnership ("TWEAN"); or (*b*) any other corporation, partnership, joint venture, trust, joint stock company or other entity as to which any one or more of Operator, TWE, TWNY or TWEAN owns or controls at least ten (10%) of the voting securities of such entity. Operator shall have the right to digitize, compress, remodulate, reformat and otherwise technologically manipulate the Signal of each Station and statistically multiplex such Signal. Operator agrees that such technological manipulation will not materially degrade the Signal in the perception of an average viewer.

     2.    Carriage: Primary Program Transport Stream. Systems carrying a Station's Signal shall retransmit the primary programming transport stream, which shall contain the Network programming, together with any material that qualifies as program-related material that the FCC requires a cable operator retransmitting the broadcast signal of a television station pursuant to the FCC's must carry rules to retransmit, to the extent technically feasible, in each case that is contained within such Signal ("Digital Programming"). For so long as a Station is the exclusive full-power station licensed to such Station's DMA that is affiliated with the pertinent Big 4 Network, such Station provides the pertinent Systems with a good quality signal, and such Station has validly elected retransmission consent for the relevant period, Operator shall (*a*) carry the Digital Programming of such Station on each upgraded cable System that is located in the DMA of such Station (each, a "DMA System"); (*b*) either (*i*) if a System is all-digital, carry a standard definition format ("SD") version of such primary programming transport stream (station-provided, if any, or downconverted) on each such System in the DMA, as long as such System is carrying in SD format the signal of any other Big 4 Network-affiliated station pertinent to such DMA; or (*ii*) if a System is not all-digital, carry a downconverted version of such primary programming transport stream in

---

[1] A current list of each Station, along with its primary network affiliation (such primary affiliation, "Network") is attached as Exhibit A. Each Station primarily affiliated with the ABC, CBS, NBC or Fox national broadcast network (each a "Big 4 Network") is referred to herein as a "Big 4 Station."

EXHIBIT B

analog format on each System in the DMA, as long as such System is downconverting to analog format the signal of any other Big 4 Network-affiliated station pertinent to such DMA; and (c) in the event that Athens County, Ohio, is not located in the DMA of WBNS, carry the Digital Programming of WBNS on Systems located in Athens County, *provided* that Operator may, in its discretion, carry WBNS on Systems located in Athens County in high definition, SD and/or analog format. The Digital Programming shall be carried on a channel position in the same neighborhood as the channel positions of the primary programming transport streams of other local broadcast television stations affiliated with a Big 4 Network.

      3.    <u>Carriage: Multicast Stream</u>. If the pertinent Station is the exclusive in-market Big 4 Station, such Station provides the DMA Systems with a good quality signal, such Station has validly elected retransmission consent for the relevant period, and the pertinent multicast (a) consists of professionally-produced full-screen video programming 24-hours per day, 7-days per week, (b) does not substantially duplicate the programming of any in-market broadcast television station or programming channel carried by the pertinent DMA System (*provided* that this subsection (b) shall not apply to a particular Qualifying Multicast (as defined below) if Operator commences carriage of such duplicating programming after commencing carriage of such Qualifying Multicast), and (c) is not a religious station, does not contain any "home shopping" programming and, with respect to each Station, does not contain "infomercial," "advertorial" or other paid programming in excess of the general quantity of such programming contained in the existing multicast of such Station as of the date hereof (each multicast satisfying the foregoing conditions, a "<u>Qualifying Multicast</u>"), then DMA Systems required to carry the pertinent Station shall be obligated, within ninety (90) days of the date hereof (or of the date Operator receives notice from Owner of such Station's launch of a Qualifying Multicast, such notice to include a description of the Qualifying Multicast content) to launch and carry (so long as the Qualifying Multicast continues to satisfy the foregoing conditions) one (1) Qualifying Multicast of WBNS and up to two (2) Qualifying Multicasts of WTHR; *provided, however,* that each such DMA System shall be required to carry the pertinent Qualifying Multicast only in standard definition format. As of the Effective Date, the multicasts set forth in Exhibit A are Qualifying Multicasts, and Owner represents and warrants that, as of the Effective Date, such multicasts comply with the criteria set forth in this paragraph. Pursuant to Section 325(b) of the Communications Act of 1934, as amended, Owner hereby grants Systems the right to retransmit WALV-CA, and acknowledges and agrees that DMA Systems that are required to carry the SkyTrak Weather Network Qualifying Multicast may carry WALV-CA in lieu thereof for so long as WALV-CA is affiliated with the SkyTrak Weather Network.

      4.    <u>ONN</u>. Owner grants Operator the right, and Operator hereby accepts the obligation, during the Term to carry the ONN service (as defined in Section 2 of the Existing ONN Agreement, as defined below, subject to any adjustments in such service in effect as of December 2011, the "<u>ONN Service</u>") on all Systems that carried the ONN Service as of December 2011 (the "<u>ONN Systems</u>") in accordance with the terms and conditions of the Affiliation Agreement made as of August 10, 2000 by and between Time Warner Cable, a division of Time Warner Entertainment Company, L.P. and Dispatch Productions, Inc., excluding any amendment thereto (the "<u>Existing ONN Agreement</u>"). For clarity, beginning on the date hereof and continuing throughout the Term, (a) Operator shall not have to pay Owner any license fee or other consideration for carriage of the ONN Service, (b) delivery of the ONN Service to the ONN Systems shall be in a manner consistent with the method of delivery in effect as of December 2011, and (c) any breach of either party with respect to the terms and conditions of the Existing ONN Agreement incorporated herein shall be subject to the cure period set forth in Section 10 below. Owner represents, warrants and covenants that the ONN Service shall not deviate materially from the type, quantity, quality and mix of programming contained therein as of January 2012, sample days of which are set forth in the programming grid attached hereto as Exhibit B.

      5.    <u>Term</u>. January 4, 2012 through 5:00 p.m. on June 30, 2015 (the "<u>Term</u>").

6.  Fees. For so long as a Station is the exclusive in-market Big 4 Station and such Station has validly elected retransmission consent for the relevant period, Operator shall pay to Owner a monthly "cash payment" ("Fee") for each Operator video subscriber located within the Station's DMA to whom Operator retransmits such Station's Big 4 Network-affiliated primary program transport stream over a System pursuant to this Agreement ("DMA Subscriber"). Operator shall use its standard methods for calculating the number of DMA Subscribers, as generally applied to other broadcast television stations carried by Operator, for which a fee is due. The Fee payable for each month shall be due forty-five (45) days after the end of such month. The amount of the monthly, per-DMA Subscriber Fee shall be as follows:



| Year | Monthly Fee/DMA Subscriber |
|---|---|
| 2012 | |
| 2013 | |
| 2014 | |
| 2015 | |

7.  Audit. Owner (itself or using a public accounting firm reasonably acceptable to Operator) shall have the right, upon not less than thirty (30) days' prior written notice, during the Term and for one (1) year thereafter, at its cost, to inspect at Operator's offices, during normal business hours and without interfering with the operation of Operator's business, the books and records of Operator that are related directly to the Signal(s) to the extent necessary to verify the Fees due; *provided* that such inspections shall be limited to once in any calendar year and shall be limited to the Fees paid in the then-current calendar year and the prior calendar year, and any claim shall be made within four (4) months after the completion of the inspection in which an underpayment is identified. Owner will be deemed to have waived any and all claims it may have with respect to an underpayment of Fees due unless it gives written notice of such claims to Operator upon the earlier of thirty (30) months after the date on which payment of such Fees was due or within four (4) months after the completion of the inspection in which the underpayment was identified. In the event of a claim of underpayment by Owner following such an inspection, Owner shall, within four (4) months after the completion of such an inspection, provide Operator with all written reports related to such inspection (or, if no written reports are generated, a true and complete written description of the findings and conclusions of the inspection).

8.  Advertising Purchase. For so long as a Station is the exclusive in-market Big 4 Station and such Station has validly elected retransmission consent for the relevant period, Operator agrees to purchase a schedule of advertising spots and/or sponsorships in an annual amount equal to the product of $0.10 multiplied by the number of DMA Subscribers for each Big 4 Station during each calendar month during such year (the "Ad Purchase Commitment"). Such advertising and sponsorship purchases will be (*i*) placed according to a mutually agreed upon schedule, (*ii*) net of agency fees or other commissions, and (*iii*) Operator will receive comparable rates of the applicable property for similar commercial advertisers for ad purchases of similar size, day-parts and programming (based on the aggregate annual advertising amount on such property for such year during the term), and subject to Station's standard terms and conditions that are applicable, and consistently applied, to comparable commercial advertisers. Operator shall be allowed to satisfy the Ad Purchase Commitment by purchasing advertising and/or sponsorships on any one or more Stations and/or any other Owner or Owner-affiliated property (*e.g.*, The Columbus Dispatch, WBNS radio, or ONN), and in any given month during the Term (*i.e.*, Operator is not required to satisfy the Ad Purchase Commitment in the particular month in which such commitment accrues). Owner shall provide proof of advertising to Operator consistent with its procedures for similar commercial advertisers. If Operator has, by the end of the applicable calendar year (or partial year, as applicable), failed to order sufficient advertising to meet the Ad Purchase Commitment for such time period, then Operator shall be obligated to make full cash payment in satisfaction of any such shortfall in

Redaction above of proprietary and commercially sensitive information

the Ad Purchase Commitment for such time period together with the first Fee payment due after the end of such time period.

9. <u>Start Over, Look Back, VOD</u>: Owner hereby grants Operator a right and license to enable Start Over (as defined below), Look Back (as defined below) and VOD (as defined below) on each System carrying a program transport stream of a Station for each program contained in such program transport stream that Owner or Station produces (e.g., local news) and for which Owner or Station owns or licenses sufficient rights to authorize Start Over, Look Back and VOD (each as applicable) distribution at no incremental cost to Owner or Station. The foregoing license shall include the right to record and technologically manipulate each program to the extent necessary to distribute each program on a Start Over, Look Back and VOD basis. In the event that Operator obtains or has obtained Start Over, Look Back or VOD rights from a third party with respect to programming included in the Signal that is not produced by Station (e.g., through an agreement with the Network), then the terms of this Agreement shall not prohibit Operator from exploiting such Start Over, Look Back and VOD rights (*e.g.*, if consistent with such rights, Operator may record such programming from the Signals for purposes of implementing Start Over, Look Back and VOD); *provided* that Operator shall indemnify Owner and Station for any liability resulting from such distribution to the extent that any losses result from Operator's failure to obtain the rights for distribution of such programming on such basis (or Operator's failure to comply with the agreement or license under which it obtains such rights). "<u>Start Over</u>" means that functionality whereby a viewer may start viewing a program that is in progress, from its beginning, at any time during the period of such program's linear exhibition. "<u>Look Back</u>" means that video on demand functionality whereby a viewer may access for viewing a program at any time during the period that is within seventy-two (72) hours (or such longer period as Nielsen or any successor agency may establish as a measurement for time-shifted viewing (e.g., C-5, C-10)) after the end time of such program's linear exhibition. "<u>VOD</u>" means that mode of exhibition whereby a viewer may select and view a program at any time at such viewer's discretion during such program's access window.

10. <u>Termination</u>: Each party shall have the right to terminate this Agreement upon providing the other party with sixty (60) days prior written notice in the event of a material breach by the other party, *provided* that such other party does not cure such breach during such sixty (60) day period.

11. <u>Confidentiality</u>. The terms and conditions, other than the existence and duration, of this Agreement ("<u>Confidential Information</u>"), shall be kept confidential by the parties and shall not be disclosed to any third party except: (*i*) to a party's officers, directors, employees, auditors, agents and attorneys, in their capacity as such; (*ii*) to enforce a party's rights hereunder before a court or government agency of competent jurisdiction. This Section shall continue throughout the Term and shall survive, indefinitely, the expiration or termination of this Agreement, regardless of the reason for such expiration or termination.

12. <u>Miscellaneous</u>. Station agrees to indemnify and hold Operator harmless from any third party claims arising out of (*x*) Operator's distribution of the Signal(s), or programs contained therein, as authorized by this Agreement (*provided* that the foregoing indemnification shall not apply to any failure by Operator to secure the compulsory copyright license pursuant to 17 U.S.C. § 111, which license shall be the sole responsibility of Operator), and (*y*) the Signal(s), or programs contained therein (including an claims alleging violation of any FCC broadcast rule or regulation, libel, slander, defamation or indecency, or infringement of the intellectual property rights or rights of privacy or publicity of any person), except to the extent that such claims arise out of any deletion or addition to or modification of such programming after delivery thereof by Station (*provided* that such exception shall not apply to any deletion or addition to or modification authorized hereunder or required by applicable laws, rules or regulations (including those of the FCC)). Operator agrees to indemnify and hold Owner and each Station harmless from any third party claim arising out of (*a*) Operator's distribution of the Signal(s), or programs contained therein,

in a manner or area not authorized by this Agreement, and (*b*) any deletion or addition to or modification of the programming after delivery thereof by Station, except as authorized hereunder or required by applicable laws, rules or regulations (including those of the FCC).  Except with respect to third party claims subject to indemnification pursuant to the foregoing, neither Owner nor Operator shall for any reason or under any legal theory, be liable to the other or any third party for any special, indirect, incidental, statutory or consequential damages or for loss of profits, revenues, data or services, regardless of whether such damages or loss was foreseeable and regardless of whether it was informed or had direct or imputed knowledge of the possibility of such damages or loss in advance.  Notwithstanding anything herein to the contrary, Operator may discontinue carriage of a Signal (or any portion thereof) that it is otherwise obligated to carry if (*i*) the compulsory copyright royalty obligations pursuant to 17 U.S.C. § 111 ("Compulsory License") for retransmission of such Signal materially increase with respect to any DMA System(s), or (*ii*) the Compulsory License is no longer available, either generally or with respect to any portion of such Signal being retransmitted by Operator.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and cancels and supersedes all previous or contemporaneous agreements and understandings (whether oral or written) between the parties with respect to the subject matter hereof.  If during the Term a Time Warner Company acquires any additional multichannel video programming distribution system that is in a Station's DMA or that carries a Station's Signal as of the date of such acquisition, then such system shall be added to this Agreement and deemed to be "System" for purposes hereof upon the effective date of the acquisition of such system; *provided, however*, that if such system is eligible to retransmit such Station's Signal pursuant to another then-existing retransmission consent agreement governing carriage of such Station, then at Operator's option such system shall be added to this Agreement and deemed to be "System" for purposes hereof upon expiration of such then-existing retransmission consent agreement.  Each provision of this Agreement that by its nature should survive expiration or termination shall so survive, including without limitation the provisions of Sections 7 and 11.

Please sign below to indicate your agreement with the foregoing.

                Sincerely yours,

                TIME WARNER CABLE INC.
                60 Columbus Circle
                New York, NY 10023

                By: Melinda C. Witmer
                Title: EVP and Chief Video and Content Officer

Acknowledged and Agreed:

DISPATCH PRINTING COMPANY D/B/A DISPATCH BROADCAST GROUP

By: _____
      Michael J. Fiorile
Title: ____President and COO____

Date: ____January 4, 2012____

6

## EXHIBIT A

| STATION | PRIMARY NETWORK* | MULTICASTS* |
|---|---|---|
| WBNS | CBS | AccuWeather |
| WTHR | NBC | SkyTrak Weather Network<br>MeTV |

* As of January 4, 2012.

## **EXHIBIT B**

<u>ONN Programming Sample</u>

1/4/12 · TitanTV - Single Channel View Page

| | Wednesday Jan, 4 | Thursday Jan, 5 | Friday Jan, 6 |
|---|---|---|---|
| 12 AM | Revenue Frontier (TV-Y) | Revenue Frontier (TV-Y) | Revenue Frontier (TV-Y) |
| 12:30 AM | | | |
| 1 AM | | | |
| 1:30 AM | | | |
| 2 AM | | | |
| 2:30 AM | | | |
| 3 AM | | | |
| 3:30 AM | | | |
| 4 AM | | | |
| 4:30 AM | | | |
| 5 AM | Revenue Frontier (TV-Y) | Revenue Frontier (TV-Y) | Revenue Frontier (TV-Y) |
| 5:30 AM | Ohio This Morning (New, News, TV-Y) | Ohio This Morning (New, News, TV-Y) | Ohio This Morning (New, News, TV-Y) |
| 6 AM | | | |
| 6:30 AM | | | |
| 7 AM | | | |
| 7:30 AM | | | |
| 8 AM | | | |
| 8:30 AM | | | |
| 9 AM | | | |
| 9:30 AM | | | Westfield Insurance Brain Game Cuyahoga Falls vs Granville |
| 10 AM | Ohio & Company (Repeat, Information, TV-Y) | Flavors of America with Chef Jim Coleman | American Builder Productions (Repeat) |
| 10:30 AM | Chef's Kitchen (New, Food, TV-Y) | Chef's Kitchen (New, Food, TV-Y) | Chef's Kitchen (New, Food, TV-Y) |
| 11 AM | Healthy Flavors Mediterranean | Paid Program: Lifelock Montel 1A | Ohio & Company (Repeat, Information, TV-Y) |
| 11:30 AM | Discover Ohio All Things Aqua: Zoombezi Bay, | Ohio & Company (Information, TV-Y) | Discover Ohio All Things Aqua: Zoombezi Bay, |
| 12 PM | Buckeye Blitz (Sports) | Crew Xtra (Repeat, Sports, TV-Y) | Chef Tami (Repeat, Food, TV-Y) |
| 12:30 PM | Buckeye Blitz (Sports) | Discover Ohio All Things Aqua: Zoombezi Bay, | Discover Ohio All Things Aqua: Zoombezi Bay, |
| 1 PM | 10TV News HD @ Noon (New, News, TV-Y) | 10TV News HD @ Noon (New, News, TV-Y) | 10TV News HD @ Noon (New, News, TV-Y) |
| 1:30 PM | News Channel 5 at Noon (New, News, TV-Y) | News Channel 5 at Noon (New, News, TV-Y) | News Channel 5 at Noon (New, News, TV-Y) |
| 2 PM | Local 12 at Noon (New, News) | Local 12 at Noon (New, News) | Local 12 at Noon (New, News) |